08-4518-cv
*Southern New England Telephone Co. v. Global NAPs Inc., et al.*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2008

Argued: August 6, 2009          Decided: August 25, 2010

Docket No. 08-4518-cv

_____

SOUTHERN NEW ENGLAND TELEPHONE COMPANY,

*Plaintiff-Counter-Defendant-Appellee*,

-v.-

GLOBAL NAPS INC.,

*Defendant-Counter-Claimant-Appellant*,

FERROUS MINER HOLDINGS, LTD., GLOBAL NAPS NETWORKS, INC., GLOBAL NAPS
NEW HAMPSHIRE, INC., GLOBAL NAPS REALTY, INC.,

*Defendants-Appellants*.

_____

Before: POOLER, HALL, and LIVINGSTON, *Circuit Judges*.

Appeal from a grant of summary judgment of the United States District Court for the District

of Connecticut (Janet C. Hall, *District Judge*) in favor of Plaintiff-Appellee Southern New England

Telephone Co. ("SNET") on its claim against Defendant-Appellant Global NAPs Inc. ("Global")

seeking payment for services rendered pursuant to its federal tariff, and from a civil contempt order

entered against Global and a default judgment entered against all appellants for failure to comply

with discovery orders. We reject Global's argument that the Telecommunications Act of 1996, 47 U.S.C. § 251 *et seq.*, divests the federal courts of subject matter jurisdiction over claims seeking the enforcement of a federally filed tariff whenever adjudication of the claims requires the interpretation of an interconnection agreement between telecommunications carriers. We also conclude that the district court did not abuse its discretion in imposing the discovery sanctions it did. In an accompanying summary order, we affirm the district court's grant of summary judgment in favor of SNET on the merits of its federal tariff claim.

AFFIRMED.

––––––––––––––––––––––––––––––––––––

JOEL DAVIDOW, Kile Goekjian Reed & McManus, PLLC, Washington, D.C.; William J. Rooney, Jr., Jeffrey C. Melick, Global NAPs Inc., Norwood, Massachusetts, *for Defendants-Appellants Global NAPs Inc., et al.*

HANS J. GERMANN, Christian F. Binnig, Mayer Brown LLP, Chicago, Illinois; Scott A. Chesin, Mayer Brown LLP, New York, New York; Timothy P. Jensen, Hinckley, Allen & Snyder LLP, Hartford, Connecticut, *for Plaintiff-Appellee Southern New England Telephone Co.*

SCOTT H. ANGSTREICH, Kelly P. Dunbar, Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC, Washington, D.C.; Richard P. Owens, Verizon, Boston, Massachusetts, *for amicus curiae Verizon Telephone Cos.*

––––––––––––––––––––––––––––––––––––

DEBRA ANN LIVINGSTON, *Circuit Judge*:

This case presents a number of questions arising from a dispute between Plaintiff-Appellee The Southern New England Telephone Company ("SNET") and Defendant-Appellant Global NAPs Inc. ("Global"), its affiliated companies Global NAPs Networks, Inc., Global NAPs New Hampshire, Inc., and Global NAPS Realty, Inc., and its parent company Ferrous Miner Holdings,

2

Inc. ("Ferrous Miner") (collectively "defendants" or "appellants") over Global's alleged failure to pay SNET for twenty-six special access servers Global ordered from SNET between 2002 and 2004. On March 26, 2007, the United States District Court for the District of Connecticut (Janet C. Hall, *District Judge*) granted in part SNET's motion for summary judgment on Count I of SNET's complaint, which alleged that Global owed SNET payment for twenty-one of the twenty-six servers at issue at a rate determined by SNET's federal tariff. The district court thereafter granted SNET's motion for a default judgment against both Global and the remaining appellants for failure to comply with various discovery orders related to their corporate structure and financial information, and the court entered a default judgment against all defendants on July 9, 2008. The default judgment in turn incorporated two earlier court orders: an order of July 9, 2007, sanctioning Global for civil contempt for failure to comply with separate discovery orders and an April 25, 2008, order imposing on Global the obligation to pay SNET's fees and costs in connection with the litigation of SNET's contempt motion. The default judgment resulted in a joint and several award to SNET in the amount of $5,247,781.45, plus $645,761.41 in fees and costs. We affirm, holding that 1) the district court had subject matter jurisdiction over this action, 2) the district court had personal jurisdiction over the appellants, and 3) the imposition of a civil contempt order and a default judgment as discovery sanctions pursuant to Federal Rule of Civil Procedure 37 was not an abuse of the district court's discretion. In a summary order filed contemporaneously with this opinion, we also conclude that the district court properly entered summary judgment in favor of SNET on the merits of Count I of its complaint.

## I. Background

**A.**

In order to "promote competition and reduce regulation" in the provision of local telephone service, which up until that point had been supplied through a system of monopoly local carriers, Congress passed the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified as amended in scattered sections of 47 U.S.C.) ("Telecommunications Act" or "Act"). *See id.* pmbl., 110 Stat. 56; *see also Global NAPs, Inc. v. Verizon New England, Inc.*, 454 F.3d 91, 94 (2d Cir. 2006); Peter W. Huber et al., *Federal Telecommunications Law: 2004 Cumulative Supplement* (2d ed. 1999) § 1.2. To effectuate these purposes, the Act requires telecommunications carriers to "interconnect" with each other's networks. *See* 47 U.S.C. § 251(a)(1). Because new entrants into a local telecommunications market, lacking the established network of the preexisting carrier, face high barriers to entry, so-called "incumbent local exchange carriers" ("ILECs") — the preexisting local carriers that had provided telephone services to a given area prior to the effective date of the Act, *see id.* § 251(h)(1) — have a duty to negotiate agreements with so-called competing local exchange carriers ("CLECs"), newcomer carriers who request to interconnect with the ILEC's network. *See id.* §§ 251(c)(1); 252(a)–(b); *see also BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., Inc.*, 317 F.3d 1270, 1273 (11th Cir. 2003) (en banc). These agreements, called interconnection agreements ("ICAs"), must provide a requesting CLEC with interconnection into the ILEC's network "for the transmission and routing of telephone exchange service and exchange access" according to standards set forth in the Act. 47 U.S.C. § 251(c)(2)(A)–(D).

The Act lays out a detailed procedure for carriers to follow in entering into ICAs. Carriers may adopt an ICA either through voluntary negotiation or through a process referred to as "arbitration" in the relevant state public utilities commission ("PUC"). Under the first option, upon

4

receiving a request to interconnect from a CLEC an ILEC may enter into a binding agreement with the CLEC for the provision of interconnection and related services. 47 U.S.C. § 252(a)(1). Alternatively, if the parties cannot agree privately on the terms of an agreement, either party may petition the relevant state PUC to "arbitrate" "any open issues." *Id.* §§ 252(b)–(c). In either case, the state PUC must also approve the final ICA. *Id.* § 252(e)(1). The state PUC may reject a voluntarily negotiated agreement if it concludes that the agreement results in "discriminat[ion] against a . . . carrier not a party to the agreement" or if the agreement is "not consistent with the public interest, convenience, and necessity." *Id.* § 252(e)(2)(A). The PUC may reject an agreement adopted after an arbitration proceeding if it finds that the agreement does not conform to the standards for ICAs laid out in § 251 of the Act. *Id.* § 252(e)(2)(B).[1]

The Telecommunications Act provides varying routes to judicial review at this "approval stage" of an ICA, depending on whether the state PUC has acted on the agreement within a statutory time limit. The PUC has a limited amount of time in which to grant or deny its final approval of an ICA. *Id.* § 252(e)(4). If the PUC makes a "determination" under § 252, "any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement . . . meets the requirements of [§§ 251 and 252]." *Id.* § 252(e)(6). If, however, a state PUC fails to take an action either granting or denying its final approval to an ICA within the § 252(e)(4) time limits, the Federal Communications Commission ("FCC") may "preempt[]" the state PUC's jurisdiction over the ICA and undertake to itself the role of approving or rejecting the agreement. *Id.* § 252(e)(5). In such a case, the FCC proceeding and any judicial review that follows

---

[1] The Act also allows a CLEC to choose to adopt the terms and conditions of an existing ICA that the ILEC has entered into with another CLEC and which a state PUC has already approved. *See* 47 U.S.C. § 252(i).

5

is the "exclusive remed[y]" for a state PUC's failure to act on an ICA. *Id.* § 252(e)(6).

As a separate matter, beginning with the Communications Act of 1934, ch. 652, 48 Stat. 1064 (1934) (codified as amended at 47 U.S.C. § 151 *et seq.*), federal law has required common carriers of communications to file a list of tariffs with the FCC specifying the charges the carriers will impose for the transmission of communications over their systems and between their systems and others. *See* 47 U.S.C. § 203(a); *ICOM Holding, Inc. v. MCI Worldcom, Inc.*, 238 F.3d 219, 221 (2d Cir. 2001). Pursuant to the "filed rate doctrine," once its tariff is filed and approved by the FCC, a carrier may not charge a rate for a particular service different from that specified in the tariff, and it may not "extend to any person any privileges or facilities in [any] communication" except as specified in the tariff. 47 U.S.C. § 203(c); *see also Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222 (1998); *ICOM*, 238 F.3d at 221. Until replaced by a new tariff, filed with and approved by the FCC pursuant to the same procedure, a common carrier's tariff has the force of law; parties may not alter the rights and liabilities defined in the tariff by contract or through any other means. *ICOM*, 238 F.3d at 221.

**B.**

In 2000, Global, a CLEC, asked SNET, an ILEC, to enter into an ICA pursuant to the Telecommunications Act. Among the issues to be resolved in this agreement were "the terms and conditions under which the parties would physically interconnect their networks at a 'point of interconnection,' or 'POI.'" *S. New England Tel. Co. v. Global NAPs, Inc.*, 482 F. Supp. 2d 216, 219 (D. Conn. 2007) (summary judgment ruling) ("*SNET I*"). The parties submitted to arbitration before the Connecticut Department of Public Utility Control ("DPUC"), which approved the inclusion of certain language in the ICA relevant to which party would bear the responsibility of transporting so-

6

called "FX" or "foreign exchange" traffic. In October 2002, the parties physically interconnected their networks in New Haven, Connecticut.

Between 2002 and 2005, Global ordered a number of circuits and signaling links from SNET to carry Global traffic. According to SNET's complaint, SNET billed Global for providing these services in accordance with the rates set out in SNET's federal tariff, but Global refused to pay SNET for its purchases. SNET filed this action in December 2004; Count I of SNET's complaint sought payment from Global for its failure to pay the tariffed rates for the services SNET had rendered.[2] Global countered that the parties' ICA allocated responsibility to SNET to provide the circuits.

In December 2005 SNET moved for a prejudgment remedy against Global as well as disclosure from Global of its assets, including any and all cash, stocks, bonds, bank and investment accounts, real or personal property, and debts owing to Global. The district court, finding that SNET had shown a likelihood of success on the merits, granted SNET's motions on May 5, 2006, awarding SNET a prejudgment remedy of $5.25 million and ordering Global to disclose its property and assets. There began a lengthy battle over discovery of those assets, detailed exhaustively in the

---

[2] SNET brought other claims that are not the subject of this appeal. SNET alleged, *inter alia*, that Global participated in a scheme to misroute long distance calls to SNET customers over certain connection facilities in violation of SNET's federal and state tariffs and the parties' ICA. This misrouting scheme, SNET alleged, deprived it of certain charges it could have collected had Global routed these calls over the proper connection (so-called "trunking") facilities. Counts II through IV of SNET's amended complaint relate to these misrouting allegations, while Counts V and VI, brought under the Connecticut Unfair Trade Practices Act, address both Global's alleged failure to pay the tariffed rate for the circuits it ordered and its alleged misrouting of long distance calls. The district court stayed SNET's claims relating to misrouting pending the conclusion of FCC proceedings related to these claims. In its decision on SNET's motion for a default judgment, the district court administratively dismissed these stayed claims without prejudice to reopening within thirty days of final administrative action by the FCC.

7

district court's opinion below. *See S. New England Tel. Co. v. Global NAPs, Inc.*, 251 F.R.D. 82 (D. Conn. 2008) (default judgment ruling) ("*SNET II*"). The dispute culminated in July 2007, when the district court granted SNET's motion to hold Global in civil contempt for Global's "blatant violation[s]" of the court's attachment and disclosure orders. *See id.* at 95. The court later awarded SNET the amount of $645,760.41, the costs and fees SNET incurred in litigating its motion for contempt. More generally, the district court concluded that Global repeatedly failed to comply over the course of two years with its orders that Global produce its financial information and that Global often gave misleading or outright false answers to the court and SNET regarding whether documents existed or in whose custody they were. *See id.* at 85-87, 93-95.

In June 2006, at the time of the disclosure and attachment dispute, SNET moved to amend its complaint to add the remaining appellants — Global NAPs New Hampshire, Inc., Global NAPs Networks, Inc., Global NAPs Realty, Inc., and Ferrous Miner (collectively the "veil-piercing defendants") — as defendants. In its amended complaint SNET alleged that the "purported corporate structure of Defendants is a sham" because the various "Global" entities are in fact one company, without independence from their owner Ferrous Miner. Am. Compl. ¶ 15. The complaint alleged that all the Global entities share the same officers and directors, who are also the owners, directors, and officers of Ferrous Miner. The various entities disregard their formal separation in their interactions with each other, according to SNET, sharing employees, commingling funds which are used to pay the debts and expenses of each entity indiscriminately, and transferring customers, revenues, and assets amongst themselves without documentation. According to the complaint, while Global NAPs Inc. was the only entity authorized to provide telecommunications service in Connecticut and was SNET's counter-party in the ICA, Global NAPs Networks, Inc. had taken over

8

Global NAPs Inc.'s network functions and customer contracts. SNET asserted, in addition, that Global NAPs New Hampshire, Inc. is the "financial arm" of the enterprise, but has no customers, operations, or employees of its own. SNET charged that the companies' disregard of the corporate form facilitated a situation in which Global NAPs Inc. incurred liabilities, as it had pursuant to its business dealings with SNET, but had been stripped of any assets or revenue it might use to satisfy these obligations. SNET alleged that none of the defendants constituted "a stand-alone business" entity, but rather that each was "owned and controlled as part of a single enterprise." *Id.* ¶ 27. SNET therefore sought to pierce Global NAPs Inc.'s corporate veil and impose liability on the Global affiliates and on Ferrous Miner.

After permitting SNET to amend its complaint to include the allegations relevant to the veil-piercing defendants, the district court granted partial summary judgment in favor of SNET and against Global on the merits of SNET's tariff claim. *See SNET I*, 482 F. Supp. 2d 216. The veil-piercing defendants then unsuccessfully moved to dismiss the claims against them for lack of personal jurisdiction. In August 2007, defendants further contended, for the first time, that the court lacked subject matter jurisdiction over the tariff claim because the Telecommunications Act requires such claims to be presented first to the relevant state public utilities commission. The district court rejected this argument. *See S. New England Tel. Co. v. Global NAPs, Inc.*, 520 F. Supp. 2d 351 (D. Conn. 2007) (subject matter jurisdiction ruling).

After it was allowed to amend its complaint, SNET sought discovery regarding the allegations in its complaint on the corporate structure of Global and its affiliated companies, contended by SNET to be Global's alter egos. In May 2007 the defendants were ordered to produce the companies' financial documents. *SNET II*, 251 F.R.D. at 87. Alleging noncompliance with the

9

courts' discovery orders, SNET moved for a default judgment in August 2007 against all defendants, and the district court granted the motion with respect to SNET's tariff claim. *Id.* at 96. The final default judgment imposed liability in the amount of $5,893,542.86 on all defendants jointly and severally; this figure incorporated the amount Global owed to SNET in damages on SNET's tariff claim, $5,247,781.45, as well as $645,761.41 in fees and costs that the court had awarded SNET earlier for its efforts in prosecuting its motion for contempt. This appeal followed.

## II. Subject Matter Jurisdiction

Global's first contention on appeal is that the district court lacked subject matter jurisdiction over this case and was thus without power to enter summary judgment in favor of SNET or to impose sanctions on the defendants. Global's principal argument is that SNET's claim required the district court to interpret the parties' ICA, and that the Telecommunications Act provides that federal district courts lack jurisdiction to hear claims requiring the interpretation of ICAs in the first instance. Instead, parties seeking the interpretation or enforcement of an ICA must litigate their claim first in the relevant state PUC, the decision of which may then be appealed to a federal court. Global further contends that this requirement is jurisdictional, rather than simply an administrative exhaustion requirement, and is thus not waived or forfeited when a defendant fails to raise it as an affirmative defense. We review a district court's determination of whether it had subject matter jurisdiction *de novo*. *See Mathirampuzha v. Potter*, 548 F.3d 70, 74 (2d Cir. 2008). We are unpersuaded by Global's argument.

### A.

Federal courts are courts of limited jurisdiction, and "[t]he validity of an order of a federal

10

court depends upon that court's having jurisdiction over both the subject matter and the parties." *Ins. Corp. of Ir., Ltd. v. Compagnie Des Bauxites de Guinee*, 456 U.S. 694, 701 (1982). For the purpose of determining whether a district court has federal question jurisdiction pursuant to Article III and 28 U.S.C. § 1331, the jurisdictional inquiry "depends entirely upon the allegations in the complaint" and asks whether the claim as stated in the complaint "arises under the Constitution or laws of the United States." *Carlson v. Principal Fin. Group*, 320 F.3d 301, 306 (2d Cir. 2003); *see also Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). Provided that it does, the district court has subject matter jurisdiction unless the purported federal claim is clearly "immaterial and made solely for the purpose of obtaining jurisdiction" or is "wholly insubstantial and frivolous." *Carlson*, 320 F.3d at 306 (quoting *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)); *see also In re Stock Exchs. Options Trading Antitrust Litig.*, 317 F.3d 134, 150 (2d Cir. 2003) ("*Options Trading*"). It follows from our exclusive focus on the complaint in determining federal question jurisdiction, moreover, that whether a plaintiff has pled a jurisdiction-conferring claim is a wholly separate issue from whether the complaint adequately states a legally cognizable claim for relief on the merits. *See, e.g.*, *Carlson*, 320 F.3d at 306 ("[I]f the plaintiff really makes a substantial claim under an act of Congress, there is jurisdiction whether the claim ultimately be held good or bad." (quoting *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913)) (internal quotation marks omitted)). Thus a *defense,* however valid, does not oust the district court of subject matter jurisdiction. This is because once the court's jurisdiction has been properly invoked in the plaintiff's complaint, the assertion of such a defense is relevant only to whether the plaintiff can make out a successful claim for relief, and not to whether the court has original jurisdiction over the claim itself.

In this case, SNET's claim, pled on the face of its complaint, *see* Am. Compl. ¶¶ 29-31, 48-

11

51, is that Global ordered circuits pursuant to the terms and conditions for services included in SNET's federally filed tariff and that SNET is owed the applicable rate for such services under its tariff. It is well established that such a claim — to enforce the terms of a tariff, filed and approved pursuant to federal law — arises under federal law for the purpose of Article III and § 1331. *See, e.g.*, *Fax Telecommunicaciones Inc. v. AT&T*, 138 F.3d 479, 488 (2d Cir. 1998); *cf. Louisville & Nashville R.R. v. Rice*, 247 U.S. 201, 203 (1918) (federal question jurisdiction exists over a suit to enforce the provisions of a tariff filed and approved pursuant to the Interstate Commerce Act); *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 534 (1983) (per curiam) (same). Global's initial response is that jurisdiction is nevertheless lacking here because SNET's invocation of its federal tariff is a "wholly insubstantial," "frivolous," and artificial attempt to invoke federal jurisdiction, *Carlson*, 320 F.3d at 306, because SNET's claim is *in substance* one invoking the parties' ICA. *See* Global Br. 16 ("[P]revailing on ICA interpretive issues was crucial to SNET's claims."). For the following reasons, we disagree.

"The inadequacy of a federal claim is ground for dismissal for lack of subject-matter jurisdiction *only* when the claim is *so* insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Options Trading*, 317 F.3d at 150 (emphasis added) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)) (internal quotation marks and alterations omitted). A federal claim is not "insubstantial" merely because it might ultimately be unsuccessful on its merits. *Cf. Schwartz v. Gordon*, 761 F.2d 864, 867 n.4 (2d Cir. 1985) ("When a claim allegedly based on a federal statute must be dismissed because of the statute's inapplicability to the facts alleged, . . . the dismissal is more accurately described as based on failure to state a claim upon which relief may be granted"

12

rather than as jurisdictional.). It is true that SNET's *right to relief* on its claim in this case depended ultimately upon a favorable construction of the parties' ICA — specifically to the effect that Global rather than SNET was responsible for providing the circuits in question, and therefore that Global's ordering the circuits from SNET was a purchase of a service as provided in SNET's tariff rather than an invocation of SNET's responsibility under the ICA. But this is simply irrelevant to whether the tariff claim itself properly invoked federal question jurisdiction:

> Once a federal court has determined that a plaintiff's jurisdiction-conferring claims are not insubstantial on their face, no further consideration of the merits of the claim is relevant to a determination of the court's jurisdiction of the subject matter. Thus, the district court's subject matter jurisdiction to entertain a suit based on a federal claim that is not wholly insubstantial, frivolous, or foreclosed by prior decisions of the Supreme Court, is not defeated by the defendant's assertion of a position that is properly characterized as an affirmative defense.

*Options Trading*, 317 F.3d at 150-51 (internal quotation marks and citation omitted).

Global's argument to the contrary would have the effect of transmuting any claim against which a party raised a contract as a defense into a claim *on* that contract. We found such an argument "frivolous" in *Kamakazi Music Corp. v. Robbins Music Corp.*, 684 F.2d 228 (2d Cir. 1982), and it is equally so here. *Kamakazi*, 684 F.2d at 230. Kamakazi owned copyrights in certain sheet music, which it licensed to Robbins to sell. After the contract expired, Robbins continued to sell certain "folios" and Kamakazi sued Robbins under the Copyright Act. *Id.* at 229. Robbins contended that the sales were permitted by the parties' contract and argued therefore that Kamakazi's suit was for breach of contract, thus depriving the federal courts of jurisdiction. *Id.* We rejected the argument: "That Robbins interposed a contract as defense does not turn Kamakazi's suit under the Copyright Act into a suit for breach of contract." *Id.* True, Kamakazi's suit *could* in a certain light have been thought of as a suit based on the contract — to the effect that Robbins had

13

breached the contract by continuing to sell past the contractually specified date — but that did not make Kamakazi's choice to invoke the Copyright Act to assert its rights "insubstantial" or "frivolous." Likewise, SNET's claim in this case could be characterized as a claim to enforce the provision of the ICA requiring that a party providing FX service to its customers must pay for the transport of that traffic, with SNET's tariff providing only the measure of damages. This does not mean, however, that SNET's choice to proceed with a claim invoking its tariff was an artificial federal claim "on its face." *Options Trading*, 317 F.3d at 150. We conclude that the district court had federal question jurisdiction over the action brought by SNET.[3]

**B.**

Global next argues that even assuming SNET properly pled a tariff claim based on federal law, the Telecommunications Act divested the district court of jurisdiction over this claim because the claim raises a question regarding the interpretation of an ICA. Again, we disagree.

Global relies on § 252 of the Act, which provides in relevant part that "[i]n any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the [ICA] meets the requirements of section 251 of this title and this section." 47 U.S.C. § 252(e)(6). This provision says nothing, however, about the jurisdiction of the district courts to hear federal tariff claims, nor does it contain any language divesting the district courts of their general federal question jurisdiction over such claims. *See* 28 U.S.C. § 1331. The only "determination[s]" referred to in § 252 that are potentially relevant in this context are decisions of a state PUC approving or rejecting a final ICA (*see id.* § 252(e)) (and, potentially, decisions of the PUC in an arbitration

---

[3] We therefore need not address SNET's alternative argument that diversity jurisdiction existed in this case.

14

proceeding, *see id.* § 252(b)–(c)). Far from divesting the district court of jurisdiction over a properly pleaded tariff claim, the Act is thus silent even as to a state PUC's authority to act in the situation presented in this case: namely, where a claim raises a question of the *interpretation* of an ICA that has *already* been framed and approved by the relevant PUC. *See, e.g.*, *Core Commc'ns, Inc. v. Verizon Pa., Inc.*, 493 F.3d 333, 340 (3d Cir. 2007) ("[T]he Act is simply silent as to the procedure for post-formation disputes" concerning the interpretation or enforcement of ICAs.).

The Supreme Court has held that the judicial review provisions set forth in § 252(e)(6) — which again, by their terms, only apply to judicial review of "determinations" of a state PUC made at the approval stage of the life of an ICA — do not divest the district courts of their jurisdiction under § 1331 over original actions challenging whether decisions of a state PUC *interpreting* an ICA conform with the requirements of federal law. *See Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 641-42 (2002). In *Verizon Maryland*, Verizon's counter-party to an ICA brought a complaint relating to the interpretation of the ICA before the Maryland Public Service Commission, which had approved the formation of the ICA six months earlier; dissatisfied with the Commission's ruling, Verizon brought an action in federal district court alleging that the Commission's interpretation violated the Telecommunications Act. *Verizon Md.*, 535 U.S. at 639-40. The Supreme Court concluded that the district court had jurisdiction over Verizon's suit pursuant to 28 U.S.C. § 1331 — because it raised the question whether the state commission's ruling was invalid according to a federal statute, *id.* at 642 — and § 252(e)(6)'s specific provisions for review of *certain* state PUC determinations did not, by implication, divest the district court of its jurisdiction over Verizon's claim challenging *other* determinations by the state commission, *id.* at 642-44.

We see no reason why *Verizon Maryland*'s reasoning that § 252(e)(6) "does not *divest* the

15

district courts of their authority under 28 U.S.C. § 1331 to review [state PUCs' orders] for compliance with federal law" should not apply equally to the district courts' authority under § 1331 to consider a federal tariff claim when the provisions of an ICA are asserted in defense. *Id.* at 642. Thus SNET's claim arises under federal law pursuant to § 1331, and § 252(e)(6) does not divest the court of its jurisdiction over that claim by implication. Because we presume that "Congress legislates against the backdrop of existing jurisdictional rules that apply unless Congress specifies otherwise," *Gottlieb v. Carnival Corp.*, 436 F.3d 335, 339 (2d Cir. 2006) (citing *Shoshone Mining Co. v. Rutter*, 177 U.S. 505, 506-07 (1900)), a clear statement from Congress is required before we conclude that a statute withdraws the original jurisdiction of the district courts over "all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331. *See, e.g.*, *Verizon Md.*, 535 U.S. at 643-44; *cf. Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515-16 (2006); *Gottlieb*, 436 F.3d at 340 (recognizing the "rule that § 1332 applies to all causes of action . . . unless Congress expresses a clear intent to the contrary"). There is no language in § 252 addressing the subject matter jurisdiction of federal district courts to hear claims involving the interpretation of previously approved ICAs, let alone language amounting to a clear withdrawal of § 1331 jurisdiction over federal tariff claims. *Cf. Global NAPS, Inc. v. Verizon New England Inc.*, 603 F.3d 71, 84-85 (1st Cir. 2010) (rejecting Global's argument that § 252(e)(6) divests a federal court of subject matter jurisdiction over a counterclaim that was properly before the court pursuant to 28 U.S.C. § 1367).

Global suggests that the doctrine of primary jurisdiction is applicable here, and that pursuant to this doctrine the district court should have dismissed this action until the DPUC had a chance to rule on the interpretation of the parties' ICA. The doctrine of primary jurisdiction applies "to claims properly cognizable in court that contain some issue within the special competence of an

16

administrative agency." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993). Global contends that the interpretation and enforcement of ICAs is uniquely within the special competence of the DPUC. The Seventh Circuit has concluded that state PUCs have primary jurisdiction over at least some disputes arising out of interconnection agreements, and that in some cases involving the meaning of those agreements the most "sensible procedure" will be for a district court to refer the question to the state PUC before proceeding with the case. *Ill. Bell Tel. Co. v. Global NAPs Ill., Inc.*, 551 F.3d 587, 594 (7th Cir. 2008). We need not address Global's primary jurisdiction argument, however, because even assuming the doctrine applies to the particular claim at issue in this case, primary jurisdiction, despite its name, is not related to the *subject matter jurisdiction* of the district court over the underlying action; indeed, a court applying primary jurisdiction to refer a case or issue to an administrative agency *must* have subject matter jurisdiction over the action in order to do so. *See, e.g.*, *Reiter*, 507 U.S. at 268-69 ("Referral of the issue to the administrative agency does not deprive the court of jurisdiction; it has the discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice."); *see also Ill. Bell*, 551 F.3d at 595 ("[T]he reference of a case to an agency pursuant to [the primary jurisdiction] doctrine, rather than denying the jurisdiction of the court over the case, presupposes that jurisdiction."). But Global contends on appeal that the district court lacked *subject matter jurisdiction* over this action. Whether the claim here fell within the primary jurisdiction of the agency is irrelevant to *that* argument, and so we need not consider whether the district court in some way erred or abused its discretion in not referring the issues related to the parties' ICA to the DPUC.[4]

---

[4] Global did move to dismiss on primary jurisdiction grounds before the district court early in this litigation and, as noted previously, the district court did in fact stay SNET's claims relating to misrouting pending adjudication by the FCC, and ultimately dismissed these claims without prejudice. The district court rejected the application of the primary jurisdiction doctrine

17

It is true that a number of our sister circuits have held or assumed that state PUCs have the authority to interpret ICAs in post-approval disputes over the meaning of those agreements, even though the text of the relevant provisions of the Telecommunications Act is silent regarding any authority PUCs might have other than their authority to arbitrate the formation of ICAs and *approve* them in the first instance. We note that the rationales underlying these decisions somewhat differ, though the majority of circuits appear to have concluded that this authority is implicit in § 252, which grants PUCs "plenary authority to approve or disapprove" ICAs. *Sw. Bell Tel. Co. v. Pub. Util. Comm'n*, 208 F.3d 475, 479-80 (5th Cir. 2000).[5] In addition, the FCC determined in *In re*

to SNET's claims relating to the special access circuits on the ground that these allegations do not "require the type of policy-minded interpretative analysis" for which the doctrine is designed. *S. New England Tel. Co. v. Global Naps, Inc.*, No. 3:04-cv-2075, 2005 WL 2789323, at *6 (D. Conn. Oct. 26, 2005) (ruling on defendants' motion to dismiss). Global's only challenge to this decision on its merits is that the Seventh Circuit's decision in *Illinois Bell* established a "mandatory" rule that a district court should "abstain" from deciding a case that raises an ICA interpretive issue. Reply 6. But even apart from the fact that this alleged "rule" would not implicate the district court's subject matter jurisdiction, *Illinois Bell* made clear that the ability of a federal court to refer ICA-interpretation issues to state PUCs is a matter of the court's discretion. *See Ill. Bell*, 551 F.3d at 594-96; *see also Verizon New England*, 603 F.3d at 85 n.16. Moreover, a *per se* rule requiring referral of *any* question involving interpretation of an ICA would be at best overbroad, given the purpose of the primary jurisdiction doctrine: to allow courts to seek administrative rulings when the particular question at issue involves "technical or policy considerations" particularly within the agency's special competence. *Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 295 (2d Cir. 2006) (noting that factors to consider in determining whether to invoke primary jurisdiction include "whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise," "whether the question . . . is particularly within the agency's discretion," "whether there exists a substantial danger of inconsistent rulings," and "whether a prior application to the agency has been made"). The interpretation of an ICA — which is, after all, nothing more than a contract — will certainly not *always* involve such considerations. *See Ill. Bell*, 551 F.3d at 594.

[5] For further authority concluding that a state PUC's authority to interpret an ICA is implicit in § 252, see, for instance, *Ill. Bell*, 551 F.3d at 593-94; *Sw. Bell Tel. Co. v. Brooks Fiber Commc'ns of Okla., Inc.*, 235 F.3d 493, 497 (10th Cir. 2000); *Iowa Utils. Bd. v. FCC*, 120 F.3d 753, 804 (8th Cir. 1997), *aff'd in part and rev'd in part sub nom. AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999); and *BellSouth*, 317 F.3d at 1274-76 (concluding that the

18

*Starpower Communications*, 15 F.C.C.R. 11,277, 2000 WL 767701 (F.C.C. 2000), that state PUCs have the authority "to interpret and enforce previously approved [ICAs]," *id.* at 11,279, and some circuits have given *Chevron* deference to this determination.[6] *See, e.g.*, *Core*, 493 F.3d at 341-43; *BellSouth*, 317 F.3d at 1276-77; *Sw. Bell Tel. Co. v. Brooks Fiber Commc'ns of Okla., Inc.*, 235 F.3d 493, 497 (10th Cir. 2000). We have not expressed a view on this issue, and this case does not require us to do so.

Global relies on these cases for the proposition that questions relating to the interpretation of ICAs *must* be presented in the first instance to state PUCs. However, none of these cases holds that a PUC's authority to interpret interconnection agreements erects a *jurisdictional bar* to claims over which the district court has federal question jurisdiction pursuant to § 1331, such as SNET's tariff claim here. Indeed, in two of the cases relied on by Global, *BellSouth* and *Southwestern Bell Telephone Co. v. Public Utility Commission of Texas*, the claims at issue *were* presented to a state PUC in the first instance, so the cases did not even address the situation this case presents, in which an issue related to an ICA is first raised in a district court. *See BellSouth*, 317 F.3d at 1272-73; *Sw. Bell*, 208 F.3d at 478. *Core Communications, Inc. v. Verizon Pennsylvania, Inc.*, 493 F.3d 333 (3d

Supreme Court in *Verizon Md.* implicitly assumed the authority to exist, and finding the authority implicit in § 252).

[6] In *Starpower*, the FCC interpreted § 252(e)(5), which provides that the FCC may "preempt[]" a state PUC's jurisdiction over a proceeding under § 252 "[i]f [the] State commission fails to act to carry out its responsibility under this section." The petitioner in *Starpower* filed a claim with a state PUC seeking a declaratory ruling on a question of the interpretation of the petitioner's interconnection agreement with the respondent. The state commission declined to exercise jurisdiction over the petition. 15 F.C.C.R. at 11,277-78. The FCC concluded that the matter was one within the state commission's "responsibility" under § 252, making possible preemption by the Commission, because "inherent in state commissions' express authority to mediate, arbitrate, and approve interconnection agreements under section 252 is the authority to interpret and enforce previously approved agreements." *Id.* at 11,279.

19

Cir. 2007), Global's principal authority on appeal, is similarly distinguishable because there the Third Circuit affirmed the dismissal without prejudice of a claim *for breach of an ICA*, holding that such claims seeking "interpretation and enforcement" of ICAs "must be litigated in the first instance before the relevant state commission." *Core*, 493 F.3d at 344; *see also id.* at 337-38. *Core*'s only holding was thus that "actions" seeking the "interpretation and enforcement" of an ICA itself must be brought before state commissions. The case did not involve and did not pass on the question presented in this case: whether a district court, presented with a case involving a federal claim properly within its jurisdiction in which the defendant raises a question of ICA interpretation as a defense, *loses* federal jurisdiction because the ICA issue was not presented to a state PUC. Whatever the merits of *Core*'s conclusion with respect to ICA enforcement claims, it does not suggest that jurisdiction is lacking here.

To summarize, we conclude 1) the district court had federal question jurisdiction over SNET's tariff claim pursuant to 28 U.S.C. § 1331, and 2) nothing in the Telecommunications Act divested the district court of that jurisdiction.

### III. Personal Jurisdiction over the Veil-Piercing Defendants

We next confront appellants' argument that the district court lacked personal jurisdiction over the veil-piercing defendants — Global NAPs Networks, Global NAPs New Hampshire, Global NAPs Realty, and their parent company Ferrous Miner — and that, accordingly, the court should have granted their motion to dismiss rather than enter a default judgment against them. Where, as here, a district court in adjudicating a motion pursuant to Federal Rule of Civil Procedure 12(b)(2) "relies on the pleadings and affidavits, and chooses not to conduct a full-blown evidentiary hearing,

plaintiffs need only make a prima facie showing of personal jurisdiction." *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008) (internal quotation marks omitted). This showing may be made through the plaintiff's "own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (internal quotation marks, citation, and alterations omitted). We review the district court's resulting legal conclusion *de novo*. *Spiegel v. Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010) (per curiam). In doing so, "we construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Porina*, 521 F.3d at 126.

Appellants' principal argument is that SNET's prima facie showing was deficient because the allegations in SNET's amended complaint are "conclusory." SNET alleges that each of the appellants was an "alter ego" of Global, a fact that, if established, would clearly support a finding of personal jurisdiction. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 142-43 (2d Cir. 1991). It is also well established that the exercise of personal jurisdiction over an alter ego corporation does not offend due process. *See Transfield ER Cape Ltd. v. Indus. Carriers, Inc.*, 571 F.3d 221, 224 (2d Cir. 2009). We need only determine, then, whether SNET made sufficiently supported allegations that, if proven true, would establish that the Global entities and their parent, Ferrous Miner, are alter egos. We conclude that it did, and that the district court did not err in denying these defendants' motion to dismiss.

The factual allegations in SNET's complaint, supported by declarations and deposition testimony, constituted a specific averment of facts that, if credited, would suffice to show that all of the Ferrous Miner–owned entities operate as a single economic unit and that Ferrous Miner

21

dominates and controls the Global entities. Under either Connecticut law or a federal common law of veil piercing, this is sufficient to bring Ferrous Miner and the other Global entities within the district court's personal jurisdiction. *See, e.g.*, *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1221 (2d Cir. 1987) (noting that federal courts have disregarded corporate formalities when a corporation's owner exercises "total and exclusive domination of the corporation"); *Naples v. Keystone Bldg. & Dev. Corp.*, 990 A.2d 326, 339 (Conn. 2010) (Under Connecticut's "identity rule" for piercing the corporate veil, a plaintiff must show "such a unity of interest and ownership that the independence of the corporations ha[s] in effect ceased or ha[s] never begun, [such that] adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." (quoting *Angelo Tomasso, Inc. v. Armor Constr. & Paving, Inc.*, 447 A.2d 406, 411 (Conn. 1982))). We therefore need not decide which jurisdiction's law should govern the analysis here.

Appellants further contend that SNET was required to present a prima facie case not only that the corporate entities here operated as a single economic unit dominated by Ferrous Miner, but that "the allegedly 'sham' [corporate] structure" laid out in the complaint was "used to further some evil purpose." Global Br. 24. Under federal common law, however, SNET need only demonstrate that it would be unfair under the circumstances not to disregard the corporate form. *See Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 26 (1st Cir. 2000) ("[T]he rule in federal cases is founded only on the broad principle that a corporate entity may be disregarded in the interests of public convenience, fairness and equity." (internal quotation marks omitted)). And while Connecticut does require the plaintiff to show "improper use of the corporate form," *Naples*,

22

990 A.2d at 340, that requirement is easily satisfied by the allegation that Ferrous Miner structures the Global entities such that those companies that incur liabilities are also those without assets to satisfy them. *Cf. Ill. Bell*, 551 F.3d at 597. We conclude that the district court did not err in denying the veil-piercing defendants' motion to dismiss.

## IV. Discovery Sanctions

### A.

Global next contends that the district court abused its discretion in sanctioning Global for civil contempt and in imposing a default judgment against both Global and the veil-piercing defendants for discovery-related misconduct. Again, we disagree.

#### 1. The Prejudgment Remedy Discovery Orders and the Contempt Decision

The battle for discovery in this case began on May 5, 2006, when the district court granted SNET's motion for a prejudgment remedy in the amount of $5.25 million and at the same time ordered the disclosure of Global's assets. Specifically, SNET moved for disclosure of Global's "cash, stocks, bonds[,] . . . bank accounts and investment accounts, . . . real or personal property[,] . . ." and any debts owed to the company. Motion to Disclose, Doc. 64 (12/23/05). The court ordered Global to comply with SNET's motion for disclosure within two weeks by providing SNET with sufficiently detailed information so that SNET could attach Global's assets to satisfy the prejudgment remedy. As amply recounted in the district court's opinion below, *see SNET II*, 251 F.R.D. at 85-87, Global failed over the course of *two years* to produce its financial records and otherwise to comply meaningfully with the district court's disclosure order. For several months Global claimed that the relevant records were not in its custody. In an order dated November 27,

2006, the district court ordered Global to produce any financial records in the custody of third parties, noting that Global's failure to do so "[would] likely result in the entry of a default judgment" against it. *S. New England Tel. Co. v. Global NAPs, Inc.*, No. 3:04-cv-2075, at 5 (D. Conn. Nov. 27, 2006) (district court's ruling on SNET's motion for contempt and sanctions). The district court later justifiably concluded, based on the testimony of Janet Lima, Global's bookkeeper, that Global's protestations that it did not have custody of its own financial records were untrue. *SNET II*, 251 F.R.D. at 86. Even after Global's excuse that it did not have custody of the relevant financial records was found by the district court to be "a lie intended to delay the production of financial records in compliance with SNET's discovery requests and the court's discovery Orders," *id.*, moreover, Global still never produced its general ledger as ordered by the district court, nor did it ever obtain and produce records that were later shown to be in the possession of its accountant, a third party, *id.* at 86-87.

Separately, the district court authorized SNET to attach any property Global disclosed as an asset pursuant to the court's May 5, 2006, order granting SNET a prejudgment remedy. As part of its obligation to disclose its assets, Global emailed a list of "all [its] known assets" in Connecticut to SNET's counsel on May 22, 2006. The list did not indicate the specific locations of the disclosed assets or their value, and SNET moved to compel additional disclosure. Concluding that the disclosure was insufficient, the district court followed up with a new order on May 26, 2006, which required Global to disclose all of its assets within the State as well as their specific locations and value. Global responded on June 6, 2006, by sending a new list of assets that included the location and serial number of particular units of equipment. The district court concluded that this disclosure was vague regarding the location of several assets and, on October 3, 2006, ordered Global

24

physically to show SNET representatives the locations of the disclosed assets in order to allow SNET to attach them. The court's October 2006 order also restated clearly that SNET was entitled to attach "any . . . real or personal property disclosed by [Global]" pursuant to the court's earlier orders. Order Granting Prejudgment Remedy, Doc. 239, at 2 (10/3/06). Global then claimed that it had "replaced" the disclosed equipment with equipment it had leased, moving the disclosed equipment to a storage unit in Mystic, Connecticut. SNET attached the equipment in the storage unit, but soon discovered that the equipment there was not in fact the same equipment that Global had disclosed. Global finally allowed SNET to visit two of its five Connecticut locations in December 2006, and during these visits SNET determined that the equipment disclosed on Global's list of June 6, 2006, was still in use at the subject locations. After these initial visits, however, Global cut off SNET's access to any further Global locations; the district court concluded that in the days after SNET's visits, Global hurriedly replaced the equipment on its June 6 list with other equipment. At some point Global removed the equipment disclosed on its June 6 list to Massachusetts, where SNET was able to attach some of it in March 2007. As of the time of the district court's ruling on SNET's motion for contempt, SNET still had not been able to attach certain items of equipment that Global had disclosed over a year earlier.

SNET's contempt motion was based on Global's alleged violation of the district court's May and October 2006 orders authorizing SNET to attach Global equipment for the purpose of securing SNET's prejudgment remedy. On July 9, 2007, the district court concluded that Global had "acted willfully in violating [the] court's prejudgment Orders" allowing SNET to attach Global's Connecticut property, and ordered civil contempt sanctions: the "reasonable costs of prosecuting [SNET's] motion for contempt and sanctions, including attorney's fees, expert fees, and other costs."

25

*S. New England Tel. Co. v. Global NAPs Inc.*, No. 3:04-cv-2075, at 12-13 (D. Conn. July 9, 2007) (order on SNET's motion for contempt and sanctions) (hereinafter "July 9, 2007 Contempt Order").

2. The Veil-Piercing Discovery Orders and the Default Judgment

After SNET amended its complaint to add the veil-piercing defendants, it sought discovery on its allegations that the various Global entities were mere shell companies and controlled by Ferrous Miner. This move set off yet another round of discovery-related battles. As the district court described:

> On April 17, 2007, SNET moved the court to compel Global to comply with twenty-nine requests for the production of documents relevant to SNET's veil-piercing allegations. On May 31, 2007, this court granted SNET's Motion and ordered each of Global NAPs New Hampshire, Global NAPs Networks, and Global NAPs Realty to produce to SNET within two weeks "the books of the company," including "balance sheets, cash statements, registers, journals, ledgers" in "the form in which the records are kept," and within a slightly longer period to produce other financial documents that may have had to be gathered from third parties. The court . . . extended this Order [on June 18, 2007] to include defendant Ferrous Min[e]r Holdings, Ltd. Global was subject to the same discovery requests that were the subject of this Order.
>
> On June 15, 2007, defendants Global, Global NAPs Networks, Global NAPs New Hampshire and Global NAPs Realty . . . produced documents; however, only about a dozen pages of which contained material not previously produced. In lieu of the bookkeeping records ordered to be produced by the court, the Global defendants wrote a letter to opposing counsel explaining that they were "unable to locate copies of all the ledgers from the relevant time period." The letter relied on an Affidavit from James Scheltema, Vice President of Regulatory Affairs for Global NAPs, Inc. Scheltema claimed that, on June 12, 2007, he had undertaken a "thorough, unannounced search of all three Global NAPs locations in Massachusetts" where he located "limited documents relevant to the production requests." He attested that he "searched the hard drive of the computer used by [the Global companies' outside bookkeeper]. Although the hard drive had Peachtree [accounting] software, there was no data relating to a Global entity, merely the program.
>
> On June 21, 2007, Ferrous Min[e]r's counsel reported to SNET via email that Scheltema's search included a search for Ferrous Min[e]r's documents. Ferrous Min[e]r did not produce any documents despite the fact that its Director, Frank Gangi, testified on June 12, 2007, in different litigation that "Ferrous Min[e]r generates its own separate financial statements," and Richard Gangi [the Treasurer

26

of the Global entities] had testified on May 31, 2006, that Global's accountants "would have the financial statements of Ferrous Min[e]r Holdings."

*SNET II*, 251 F.R.D. at 87 (citations omitted).

Much of the wrangling in the district court had to do with a computer belonging to Janet Lima, the President of Select & Pay, Inc., a company used by the Global entities as a bookkeeping agent. Prior to the formation of Select & Pay, of which Lima testified she is the sole owner, Lima was a direct employee of Global NAPs. As the district court explained, the defendants claimed that the documents covered by the district court's discovery orders had been lost due to a mishap with Lima's computer:

> Defendants have falsely argued to the court that documentation for periods prior to June 2006 . . . did not exist because there had been "uncontroverted testimony that the computer Ms. Lima was using 'crashed' and all of her data was lost." Defendants went on to speculate that the "crash occurred and [the] data [was] lost in the summer of 2006."

*Id.* (alterations in original). Although there was some conflict in the defendants' evidence regarding how the computer was allegedly destroyed, *see id.* at 87-88 & n.4, the district court determined in any event that

> the "crash" of this computer should have had absolutely no impact on the production of discovery because Janet Lima testified that she "dropped" the computer she had used for the last five years in late December 2006, *after* the court-ordered deadline for production had come and gone.

*Id.* at 87. The court further noted that the defendants had not explained why the data on the computer was irretrievable. *See id.* at 88.

In January 2007, SNET acquired excerpts of defendants' financial documents through a third-party subpoena to defendants' tax accountants; many of these documents had not previously been produced, although they clearly fell within the scope of the district court's prior orders. *Id.*

These documents included some financial statements for Ferrous Miner. *Id.* According to the testimony of a representative of the accountants, several of the records produced came from the Global entities themselves and had not been created by the accountants. The representative also testified that he had in the past seen a general ledger for Ferrous Miner or one of the Global companies, even though no such ledger had yet been produced in discovery.

Upon receiving the documents from the accountants, SNET investigated the replacement computer being used by Janet Lima, which Scheltema had previously claimed to have searched. *Id.* The investigations of two groups of forensic experts revealed that numerous files from the replacement computer had been destroyed using a program called "Window Washer." According to the report of a group of forensic consultants, LECG, LLC ("LECG"), this application can be used in conjunction with a separate Shred utility, allowing the user of a file not simply to delete the file from the computer (which normally allows the file potentially to be recovered or at least its existence to be discovered) but to "shred" the file: the result is that the Shred utility "overwrites the contents of the file, scrambles the name, and deletes it." LECG, LLC, Summary of Forensic Analysis, Mar. 16, 2008, at 6. The "shred" function is not the default setting of Window Washer; a user must affirmatively choose to use it. LECG discovered significant evidence of the use of the Shred utility and Window Washer on the replacement computer:

> Parts of this program [Window Washer] were initially created on the morning of June 12, 2007, the same morning Scheltema arrived to "search" for responsive documents. . . . Lima admitted installing and running Window Washer on her computer the morning Scheltema arrived on June 12, 2007. . . . She further testified that she never ran Window Washer again.

*SNET II*, 251 F.R.D. at 88. Further analysis indicated that when Lima used the program on June 12, 2007, she used the program's "wash with bleach" function, which allows the user to overwrite

28

deleted files. *Id.* at 88-89. This was again not the program's default setting. Moreover, contrary to Lima's testimony, the program had in fact been used again: "LECG's analysis shows that Window Washer's data wiping utility [the "Shred" utility] was first used on June 16, 2007, on which day it was run three times, and was used again on June 20, 2007." *Id.* at 89.

The forensic analysis concluded that, out of 93,560 items stored in a database on the computer that held the "metadata" (records) of all files that had once existed there, nearly 20,000 had been "erased using anti-forensic software such as Window Washer's Shred utility." *Id.* "At least 103 of these files were 'user created files,' that is, 'substantive files created by a user as opposed to a computer generated record.'" *Id.* LECG was able to discern the names of three files that had been deleted: "2000 Sales Journal," "checkregisterNH7-12-2006," and "NH check Jan thru May 06."

Concluding that "all defendants [had] willfully violated the court's discovery orders by," among other things, failing to turn over records ordered disclosed, "lying to the court about the inability to obtain documents from third parties, and destroying and withholding documents that were within the scope of" the court's discovery orders, the district court granted SNET's motion for a default judgment against all defendants on SNET's tariff claim on July 1, 2008. *SNET II*, 251 F.R.D. at 96.

**B.**

1. General Principles

We review "all aspects of a District Court's decision to impose sanctions for abuse of discretion," *United States v. Seltzer*, 227 F.3d 36, 39 (2d Cir. 2000) (internal quotation marks omitted); *see also Luft v. Crown Publishers, Inc.*, 906 F.2d 862, 865 (2d Cir. 1990), mindful of the

29

Supreme Court's repeated admonition that this standard of review means what it says: that "[t]he question, of course, is not whether [we] would as an original matter have [applied the sanction]; it is whether the District Court abused its discretion in so doing." *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976) (per curiam). We review the factual findings of the district court made in support of its decision for clear error. *See Friends of Animals Inc. v. U.S. Surgical Corp.*, 131 F.3d 332, 334 (2d Cir. 1997) (per curiam).

Rule 37 provides in relevant part that:

> If a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery, . . . the court where the action is pending may issue further just orders. They may include the following:
>
> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
> . . .
> (vi) rendering a default judgment against the disobedient party; or
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A). We have indicated that "[s]everal factors may be useful in evaluating a district court's exercise of discretion" to impose sanctions pursuant to this rule, including "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009) (quoting *Nieves v. City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y. 2002)) (internal quotation marks and alteration omitted). Because the text of the rule requires only that the district court's orders be "just," however, and because the district court has "wide discretion in imposing sanctions under Rule 37," *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 135

(2d Cir. 2007) (internal quotation marks omitted), these factors are not exclusive, and they need not each be resolved against the party challenging the district court's sanctions for us to conclude that those sanctions were within the court's discretion. *See, e.g.*, *Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991).

With respect to the district court's July 2008 imposition of a default judgment against appellants, dismissal or default imposed pursuant to Rule 37 is a "drastic remedy" generally to be used only when the district judge has considered lesser alternatives. *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988). Despite the harshness of these measures, however, "discovery orders are meant to be followed," *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 853 (2d Cir. 1995), and dismissal or default is justified if the district court finds that the failure to comply with discovery orders was due to "willfulness, bad faith, or any fault" of the party sanctioned," *Salahuddin v. Harris*, 782 F.2d 1127, 1132 (2d Cir. 1986) (quoting *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rodgers*, 357 U.S. 197, 212 (1958)); *see also Cine Forty-Second St. Theatre v. Allied Artists*, 602 F.2d 1062, 1067 (2d Cir. 1979). The district court is free to consider "the full record in the case in order to select the appropriate sanction." *Nieves*, 208 F.R.D. at 535 (citing *Diapulse Corp. of Am. v. Curtis Publ'g Co.*, 374 F.2d 442 (2d Cir. 1967)).

With respect to the district court's July 2007 order holding Global in civil contempt, the district courts have the inherent power to find a party in contempt for bad faith conduct violating the court's orders "even if procedural rules exist which sanction the same conduct." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991); *see also Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767-68 (1980); *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002);

31

*cf. Armstrong v. Guccione*, 470 F.3d 89, 100-05 (2d Cir. 2006).[7] Whether imposed pursuant to Rule 37 or the court's inherent power, a contempt order is, we have recognized, a "potent weapon, to which courts should not resort where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (internal quotation marks and citation omitted). A court may, however, hold a party in contempt for violation of a court order when "the order violated by the contemnor is clear and unambiguous, the proof of non-compliance is clear and convincing, and the contemnor was not reasonably diligent in attempting to comply." *EEOC v. Local 638*, 81 F.3d 1162, 1171 (2d Cir. 1996) (internal quotation marks omitted). "We review a finding of contempt under an abuse of discretion standard that is more rigorous than usual," and we conduct a *de novo* review of any rulings of law made by the district court. *In re Grand Jury Subpoena Issued June 18, 2009*, 593 F.3d 155, 157 (2d Cir. 2010) (per curiam) (internal quotation marks omitted).

### 2. Global's Challenges to the Contempt Sanction

The contempt finding here was not an abuse of discretion. First, contrary to Global's

---

[7] The district court in this case justified the contempt sanction under its inherent power, rather than Rule 37. Although the district courts possess this inherent power, its invocation may be "needless and confusing," 8B Charles A. Wright et al., *Federal Practice & Procedure* § 2282 (3d ed. 2010), when a particular rule "directly applies" to the specific problem confronting the district court, *Chambers*, 501 U.S. at 49 n.14; *see also id.* at 50 ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power."); *Societe Internationale*, 357 U.S. at 207 (reliance on "inherent power" to dismiss an action for failure to comply with discovery orders "can only obscure analysis of the problem" when Rule 37 specifically covers such situations); *Indep. Prods. Corp. v. Loew's Inc.*, 283 F.2d 730, 733 (2d Cir. 1960) (stating, in dicta, that reliance on inherent power to dismiss action was improper when Rule 37 was available (citing *Societe Internationale*, 357 U.S. at 206-08)). Global does not take issue with this aspect of the legal basis for the district court's contempt sanction, and we therefore need not address the matter further.

primary contention on appeal, the district court's May and October orders, which ordered Global to disclose "any and all cash, stocks, bonds[,] . . . bank accounts and investment accounts, . . . real or personal property[, and] debts owing" to Global and allowed SNET to attach "any . . . real or personal property disclosed by [Global]," were perfectly clear. "A clear and unambiguous order is one that leaves no uncertainty in the minds of those to whom it is addressed, who must be able to ascertain from the four corners of the order precisely what acts are forbidden." *King*, 65 F.3d at 1058 (internal quotation marks omitted). Global disclosed its Connecticut inventory pursuant to the court's May 2006 order, and once that inventory was disclosed, it was clearly subject to attachment. Global's attempt to read an ambiguity into this order, as well as the one that followed in October, regarding whether it allowed SNET to attach replacement equipment that Global had "swapped in" for the disclosed equipment, is unavailing, as it could hardly be clearer that the "real or personal property" that SNET was allowed to attach was the *specific* property Global disclosed, not, as Global contends, any property it disclosed *or* "fungible substitutes." Global Br. 46. Second, the district court did not clearly err in concluding that the evidence of Global's noncompliance with its orders was "clear and convincing" and that Global did not act "reasonably diligent[ly]" to attempt compliance. *Local 638*, 81 F.3d at 1171. We find nothing in the record that disturbs the district court's conclusion that Global's behavior over the course of 2006 was "a naked attempt to thwart SNET's ability to secure its [prejudgment remedy]." July 9, 2007 Contempt Order at 11.

Finally, Global contends that SNET was not prejudiced by its inability to attach particular pieces of equipment that Global had disclosed to it, as SNET was (eventually) able to secure

33

sufficient attachments to satisfy the prejudgment remedy ordered by the district court.[8] This argument, however, is beside the point. Civil contempt sanctions may serve "dual purposes": securing "future compliance with court orders" and "compensa[ting] the party that has been wronged." *Paramedics Electromedicina Comercial, Limitada v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 657 (2d Cir. 2004). The district court expressly invoked the first, "coercive" purpose in imposing the sanctions here, and we see no abuse of discretion in the district court's determination that the sanctions imposed might help achieve future compliance. *See id.* at 657-58. Moreover, as SNET apparently incurred significant fees and costs in attempting to litigate its motion for contempt, after it had attempted to achieve compliance with lesser measures, the court's order requiring Global to pay SNET's fees and costs was not an abuse of discretion as it was "correlated with the loss" SNET had incurred. *Id.* at 658.

### 3. Global's Challenges to the Default Judgment

Global's argument on appeal with regard to the default judgment is that it was an "overbroad" sanction with respect to the veil-piercing defendants, Global Br. 29, because, according to Global, the district court defaulted the veil-piercing defendants on matters other than the specific issue to which the discovery orders related — whether the defendants were alter egos of Global. Global argues that the Supreme Court's decision in *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982), mandates that a Rule 37 sanction must be "specifically related to the particular 'claim' which was at issue in the order to provide discovery," *Ins. Corp. of Ir.*, 456 U.S. at 707, and that the district court was thus not permitted to default the veil-piercing

---

[8] SNET was able to attach much of the originally disclosed equipment in March 2007, only after it had moved for contempt and sanctions in December 2006 and five months after the district court's (second) order allowing SNET to attach Global's property.

34

defendants on any issue other than their alter ego status.  The district court therefore erred, Global contends, in defaulting these parties on the merits of SNET's claim and in holding these parties liable for the costs of the earlier contempt ruling against Global.  Additionally, Global argues that the district court erred in imposing sanctions on the veil-piercing defendants based on the actions of Global itself and of Janet Lima, a non-party.  Finally, Global raises a number of mitigating arguments to suggest that the sanctions lack sufficient support in the record — it contends that there was no basis for the district court to find bad faith on its part, that any documents not produced were of minimal relevance in any event, and that SNET was "never really prejudiced" by any failure on Global's part to comply with discovery orders.

*Insurance Corp. of Ireland* held that it does not violate due process for a district court to impose under Rule 37(b) an order subjecting a party to personal jurisdiction in that court as a sanction for the party's failure to comply with a discovery order seeking to establish facts relating to the court's personal jurisdiction over it.[9]  *Id.* at 698-99, 706-07.  Even assuming that Global properly reads the Supreme Court's decision in *Insurance Corp. of Ireland* to apply to all sanctions imposed pursuant to Rule 37(b) — a matter on which we express no opinion — Global's overbreadth argument is nevertheless without merit.  This is because *Insurance Corp. of Ireland*, as Global concedes, permits a court to presume from a party's willful failure to answer a discovery request relating to a particular issue that the facts of that issue are established against the noncompliant party, and makes clear that such a presumption is consistent with due process.  *Ins.*

_____

[9] Rule 37(b)(2)(A)(i) authorizes district courts to impose on a noncompliant party an order "directing that the matters embraced in the [discovery orders] or other designated facts be taken as established for purposes of the action, as the prevailing party claims."  Fed. R. Civ. P. 37(b)(2)(A)(i); *see also Ins. Corp. of Ir.*, 456 U.S. at 695 (quoting former version of this provision).

35

*Corp. of Ir.*, 456 U.S. at 705-07; *see also Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 349-54 (1909) (court had power to strike a party's answer and enter a default judgment against it for failing to comply with discovery order, as the party's noncompliance created a "presumption of fact as to the bad faith and untruth of an answer to be gotten from the suppression or failure to produce the proof ordered, when such proof concerned the rightful decision of the cause," *id.* at 351). This is precisely what happened here. By the time the district court ruled on SNET's motion for default, the court had already awarded partial summary judgment to SNET against Global on the merits of Count I of the complaint, the federal tariff claim. Thus, the only question that remained to be resolved with respect to the veil-piercing defendants was whether these entities were, in fact, alter egos of Global — if they were, Global's corporate veil could be pierced and the remaining defendants held liable for the damages Global owed SNET pursuant to the district court's earlier award of summary judgment. *Cf. Wm. Passalacqua Builders*, 933 F.2d at 143 (once alter ego status is established, "the alter egos are treated as one entity" for purposes of jurisdiction and liability (italics omitted)); *Davenport v. Quinn*, 730 A.2d 1184, 1196 (Conn. App. 1999) (alter ego corporations may be held jointly liable for debts of single entity). The district court concluded that each of the remaining defendants, including Ferrous Miner, had willfully failed to comply with discovery orders relating to these entities' corporate structure and financial information — discovery that SNET sought in order to prove its veil-piercing allegations. The district court here deemed SNET's allegations with regard to the alter ego status of the Global entities to be established when these entities failed to comply with the discovery orders related to these allegations; doing so ended the case against the veil-piercing defendants simply because all matters of liability and damages had already been resolved. *Cf. Marshall v. Segona*, 621 F.2d 763, 766 & n.3 (5th Cir. 1980) (noting that

36

Rule 37(b) sanctions deeming facts to be taken as established can be "tantamount" to the imposition of a sanction of dismissal or default in some cases). The district court was thus entitled to enter default against all defendants and hold all defendants liable for the monetary sanctions imposed on Global in the contempt ruling.

The district court did not commit any legal errors and its decision to impose default on all defendants was not an abuse of discretion. First, the record fully supported the district court's determination that the defendants acted willfully and in bad faith. *See Agiwal*, 555 F.3d at 302. The forensic reports allowed the district court to conclude that the deletion of documents from Lima's computer was intentional rather than merely negligent, the evidence supported the district court's conclusion that Global representatives willfully lied about the existence and whereabouts of certain documents, and the defendants failed to provide a good-faith explanation for their neglect in producing financial documents that clearly were the subject of the court's discovery orders.[10] Second, the Global entities' conduct was not isolated but rather formed a pattern of "prolonged and vexatious obstruction of discovery with respect to . . . highly relevant records . . . ." *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 388 (2d Cir. 1981); *see also Agiwal*, 555 F.3d at 302.[11]

---

[10] Global's contention that Janet Lima's conduct should not be imputed to any of the defendants merits little remark. Apart from the point that the sanctions imposed might well be justified even leaving aside any conduct of Lima's, the evidence supported a conclusion that Lima acted on the defendants' behalf.

[11] At the time of the district court's decision in this case, Global was engaged in litigation in the District of Massachusetts against Verizon New England, and that court also concluded that Global was engaged there in "repeated efforts to block discovery." *Verizon New England*, 603 F.3d at 81. In October 2008, the district court in the *Verizon New England* litigation also imposed a default judgment against Global on one of Verizon's counterclaims as a sanction for Global's violations of discovery orders, a decision the First Circuit recently upheld. *See id.* at 81, 93-94.

37

Third, the district court was justified in concluding that lesser sanctions would be ineffective to achieve compliance, as Global had already been sanctioned for its failure to comply with the prejudgment remedy discovery orders, *see id.*; *SNET II*, 251 F.R.D. at 95, and, in any event, district courts are not required to exhaust possible lesser sanctions before imposing dismissal or default if such a sanction is appropriate on the overall record, *see John B. Hull*, 845 F.2d at 1176-77. Finally, the defendants cannot seriously contend that they were not on notice of their discovery obligations or of the consequences of noncompliance in light of the fact, *inter alia*, that the district court's May 31, 2007, order was unmistakably clear as to the scope of defendants' production obligations and the district court had previously warned Global that failure to produce documents would likely result in the imposition of a default judgment. *See Agiwal*, 555 F.3d at 302; *Daval*, 951 F.2d at 1366.

Global responds by contending that its conduct did not merit the harsh sanctions the district court imposed because Global's noncompliance did not prejudice SNET, and the district court never concluded that any destroyed evidence would have been relevant to the litigation. But of course, as the district court pointed out, the evidence that was the subject of the discovery orders related to the defendants' corporate financial records, and was thus obviously germane to the alter ego determination that SNET was urging the district court to make. *See SNET II*, 251 F.R.D. at 93 n.6. Additionally, while the district court concluded that the Global entities engaged in the *willful* destruction of evidence, even the simple failure to produce evidence in a timely manner in and of itself can support an inference that the evidence withheld would be unfavorable to the noncompliant party. *See Residential Funding Corp.*, 306 F.3d at 109. SNET suffered prejudice, therefore, as it was deprived of what we can assume would have been evidence relevant to its alter ego allegations.

Even if SNET had suffered no prejudice from Global's conduct, however, we, along with

the Supreme Court, have consistently rejected the "no harm, no foul" standard for evaluating discovery sanctions that Global would have us apply. Although *one* purpose of Rule 37 sanctions may in some cases be to protect other parties to the litigation from prejudice resulting from a party's noncompliance with discovery obligations, *see, e.g.*, *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) (noting the relevance of "prejudice suffered by the opposing party" to determination whether to preclude evidence that was belatedly disclosed under Rule 37); *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984) (prejudice to other parties may be a relevant inquiry in determining whether default or dismissal is appropriate sanction), Rule 37 sanctions serve other functions unrelated to the prejudice suffered by individual litigants:

> Disciplinary sanctions under Rule 37 are intended to serve three purposes. First, they ensure that a party will not benefit from its own failure to comply. Second, they are specific deterrents and seek to obtain compliance with the particular order issued. Third, they are intended to serve a general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed was in some sense at fault.

*Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988); *see also Nat'l Hockey League*, 427 U.S. at 643 (noting that Rule 37 sanctions may serve both to "penalize those whose conduct may be deemed to warrant" them and to "deter those who might be tempted to such conduct in the absence of such a deterrent"). Even when a party finally (albeit belatedly) *complies* with discovery orders after sanctions are imposed, these purposes may still justify the sanctions:

> [I]f parties are allowed to flout their obligations, choosing to wait to make a response until a trial court has lost patience with them, the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules. Moreover, . . . compulsion of performance in the particular case at hand is not the sole function of Rule 37 sanctions. Under the deterrence principle of [*National Hockey League*], plaintiff's hopelessly belated compliance should not be accorded great weight. Any other conclusion would encourage dilatory tactics, and compliance with discovery orders would come only when the backs of counsel and the litigants were against the wall.

39

*Cine Forty-Second St. Theatre*, 602 F.2d at 1068 (internal quotation marks omitted). In light of the record before us, it is clear that the district court did not abuse its discretion in concluding that a default sanction here was appropriate to serve these purposes.

**V. Conclusion**

To summarize, we hold:

1) The district court had subject matter jurisdiction over this action because SNET's claim for enforcement of its federal tariff arose under federal law, 28 U.S.C. § 1331, and nothing in the Telecommunications Act of 1996 "divested" the district court of its jurisdiction.

2) SNET's allegations and supporting affidavits regarding the corporate structure of the various Global entities sufficed, under either Connecticut or federal common law, to support a prima facie case that the district court had personal jurisdiction over the veil-piercing defendants as Global's alter egos.

3) The district court did not abuse its discretion in finding Global in contempt for willfully evading and violating the prejudgment remedy discovery orders and sanctioning Global in the amount of SNET's fees and costs.

4) The district court did not abuse its discretion in imposing a default judgment on the veil-piercing defendants by deeming the facts of SNET's alter ego allegations to be established against these entities.

We have considered all appellants' remaining arguments and conclude that they are without merit. For the foregoing reasons, the judgment of the district court is AFFIRMED.