**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Plaintiff,**

v.

**Semion GRAFMAN, et al., Defendants.**

**No. 04–CV–2609 (NG)(SMG).**

United States District Court, E.D. New York.

April 4, 2011.

Barry I. Levy, Rivkin Radler LLP, Uniondale, NY, Jay Shapiro, Michael Francis Gallagher, Scott A. Resnik, Alexis Lauren Cirel, Cara A. Roecker, Katten Muchin Rosenman LLP, New York, NY, Ross O. Silverman, Jonathan L. Marks, Kathy P. Josephson, Laura A. Bernatowicz, Katten Muchin Roseman, LLP, Chicago, IL, for Plaintiff.

Jude Roberto Cardenas, Cardenas & Associates, David T. Azrin, Roger L. Stavis, David S. Douglas, Gallet Dreyer & Berkley LLP, Aaron M. Goldsmith, Fasulo Shalley & Dimaggio, Roger V. Rubin, International Law Counsel P.C., New York, NY, Bruce S. Rosenberg, for Defendants.

## OPINION & ORDER

GERSHON, United States District Judge:

Plaintiff State Farm Mutual Automobile Insurance Company ("State Farm") brings this action against numerous defendants, including defendants Jacob Kagan and Mirka United, inc. ("Mirka United"), the subjects of this motion, based on a wide-ranging fraudulent scheme designed to recover exorbitant and improper reimbursements under New York's No–Fault insurance laws, N.Y. Ins. Law § 5105 *et seq.*, and the regulations promulgated thereunder, 11 NYCRR § 65 *et seq.*

During the course of nearly five years of discovery, which only recently came to a conclusion with the deposition of defendant Kagan, plaintiff has encountered numerous instances of discovery abuse by defendant Kagan, including the intentional destruction of critical evidence in Kagan's possession. Plaintiff now brings, under Federal Rule of Civil Procedure 37(b)(2)(A), a Motion for Case Terminating Sanctions against Jacob Kagan and Mirka United, of which Kagan is the sole owner/operator.[1]

## FACTS

In support of its Motion for Sanctions, plaintiff provides a detailed and uncontradicted account, supported by record evidence, of defendant Kagan's failure to obey court orders throughout the course of discovery in this action. Defendants' two-and-a-half page response makes only a cursory, unsupported, unsworn assertion that defendants are in compliance with the court's orders. Defendants' arguments regarding compliance are therefore rejected.

### Background and Procedural History of the Action

Plaintiff is an insurance company and, under New York's No–Fault insurance laws, is required to reimburse individuals eligible for benefits under policies issued by plaintiff ("Insureds") for necessary medical equipment ("Supplies") and other services required as a result of an automobile accident. *See* N.Y. Ins. Law § 5106. Insureds, in turn, may assign their rights to benefits to medical providers in order to reimburse the providers for the necessary equipment and/or services. Medical providers may then submit requests for payment directly to plaintiff insurer. 11 NYCRR § 65–3.11.

In June 2004, plaintiff brought this action against nearly thirty-five defendants, alleging a widespread scheme to obtain fraudulently inflated and otherwise improper reimbursements for Supplies and services. In September 2007, plaintiff amended its complaint to include nearly ninety defendants. An earlier opinion, in which I denied certain defendants' motions to dismiss and motions for judgment on the pleadings, detailed plaintiff's allegations, *State Farm v. Grafman*, 655 F.Supp.2d 212 (E.D.N.Y.2009), and therefore I will discuss only those facts and allegations that relate specifically to defendant Kagan and his company Mirka United.

In its amended complaint, plaintiff alleges that defendant Kagan owned and controlled various Supplies retailers ("Retailer defendants") and also secretly, and illegally, owned, operated and controlled medical clinics ("Clinic defendants") that were fraudulently incorporated.[2] It is undisputed that, among the Retailer defendants Kagan owned was Mirka United. Plaintiff alleges that Kagan, through his illegal control of certain Clinic and Retailer defendants, including Mirka United, initiated the creation of false paperwork necessary for submission of fraudulent invoices to plaintiff for reimbursement and that his clinics provided services that were either unnecessary or never provided. Plaintiff further alleges that Kagan, through Mirka United and other Retailer defendants, purchased Supplies from wholesalers at inflated prices and then received secret cash kickbacks in exchange for doing business with a particular wholesaler. Ka-

---

1. Plaintiff also brought this motion against Milan Medical, with whom plaintiff has since settled.

2. Under New York law, only an individual licensed to practice medicine may own or operate a medical clinic. *See* N.Y. Bus. Corp. Law §§ 1503, 1507, 1508, 1511 (2011); *see also Grafman*, 655 F.Supp.2d at 221–23. Defendant Kagan is not licensed to practice medicine.

gan then submitted the inflated invoices to State Farm.

State Farm alleges violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, as well as New York common law claims of fraud and unjust enrichment. The charges involving defendant Kagan individually are counts 2 (substantive RICO violation), 3 (RICO Conspiracy), 4 (common law fraud), 6 (RICO Conspiracy), 9 (RICO Conspiracy), 52 (common law fraud), and 53 (unjust enrichment). Counts 4, 52 and 53 also include Mirka United.

In May 2008, defendant Kagan, among others, filed a motion for judgment on the pleadings. On September 21, 2009, I rejected each of Kagan's arguments in support of his motion. *See Grafman,* 655 F.Supp.2d 212. Defendant Kagan renewed many of these arguments, and included certain new arguments, in May 2010 when he moved for summary judgment on all counts against him. On September 21, 2010, I denied defendant Kagan's motion, holding that, to the extent defendant Kagan's arguments had not been rejected previously in connection with his motion to dismiss, they raised fact questions inappropriate for summary judgment.

## Discovery Disputes Leading to the Instant Motion

■ Defendants Kagan and Mirka United have been involved in a variety of discovery disputes with plaintiff since nearly the outset of this litigation. They have missed court-ordered deadlines for discovery, failed to produce relevant documents, and failed to make timely disclosures mandated by the Federal Rules of Civil Procedure. For instance, on April 11, 2006, Mirka United was ordered to produce to plaintiff its corporate tax forms and general ledgers. After nearly four years' time, several motions to compel, and threatened sanctions, Mirka United finally complied on January 15, 2010. Most recent-

ly, defendant Kagan failed to produce certain wiretap recordings and transcripts this court ordered to be produced ("Wiretap Materials"), prompting plaintiff to bring the motion currently before the court.

■ Although plaintiff points to numerous instances of discovery abuse, I will focus primarily on three instances of misconduct, including the spoliation of evidence,[3] that, especially given the overall context, provide more than sufficient basis for granting plaintiff's motion.

## *Failure to Produce the Wiretap Materials*

From January 2005 until November 2006, the New York State Office of the Attorney General ("OAG") conducted an investigation into the same activities of defendant Kagan, among others, that form the basis for plaintiff's action. As a part of this investigation, the OAG obtained nine months' worth of court-ordered wiretaps which recorded conversations between Kagan and many of his co-conspirators. On September 10, 2008, the legality of the wiretaps was upheld by Justice Chun of the New York Supreme Court, Kings County. Thereafter, the OAG provided them to Kagan through discovery in the criminal case. On January 22, 2010, Kagan pled guilty to one count of money laundering; he is now serving a prison term.

After Kagan refused plaintiff's discovery request for relevant portions of the recordings and transcripts, plaintiff filed a motion to compel production of the Wiretap Materials.[4] During oral argument on the motion, defendant Kagan's counsel in this action, Bruce Rosenberg, Esq., represented to the court that defendant Kagan had informed him Kagan was in possession of the Wiretap Materials. 7/1/09 Hearing Tr., at 12, 15. Chief Judge Steven M. Gold, who is supervising discovery in this case, asked if Kagan's criminal counsel, Edward Hayes, Esq., who was more familiar with the materials, would

---

**3.** "Spoliation is the destruction or significant alteration of evidence, *or the failure to preserve* property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999) (citation omitted) (emphasis added).

**4.** To facilitate the production of only the most relevant portions of the wiretap recordings and transcripts, plaintiff narrowed its request to those portions of the recordings and transcripts that were utilized in two OAG affidavits filed in connection with the OAG's investigation.

review the recordings in order to determine which were relevant. After plaintiff provided Mr. Hayes with a brief description of relevant materials, *see* Pl.'s Mot. for Sanctions, Ex. 9, Mr. Hayes responded by informing plaintiff that none of the Wiretap Materials in defendant Kagan's possession "relate to any of the issues" in plaintiff's description. *See* Pl.'s Mot. for Sanctions, Ex. 10. A short time later, however, plaintiff discovered two OAG affidavits (see footnote 4) that quoted extensively from the Wiretap Materials.[5] The quotations in the OAG affidavits related directly to the allegations in plaintiff's complaint. Plaintiff, therefore, renewed its motion to compel.

On September 22, 2010, I granted plaintiff's motion to compel.[6] 9/22/10 Hearing Tr., at 29–34. After denying defendant Kagan's motion for reconsideration, I ordered Kagan to produce the wiretap recordings and transcripts in "his or his attorney's possession containing a conversation that is either expressly quoted or in any way described in either the [OAG affidavit] in Support of Search Warrants or the [OAG affidavit] in Support of Plaintiff's Application for Ex Parte Order of Attachment." I further ordered that "[d]efendant must produce to plaintiff the entirety of any such conversation, and not merely the specific portion quoted or described in the affidavits." As I emphasized in my decision on Kagan's motion for reconsideration, without production of the Wiretap Materials, there would exist an unacceptable "informational inequality" based on Kagan's unfettered, sole access to materials highly relevant to the claims against him. 10/13/10 Hearing Tr. at 19–22; 10/15/10 Order, Docket 997; *see also SEC v. Rajaratnam,* 622 F.3d 159, 174–75 (2d Cir. 2010) (stating the "the role of civil discovery [is to] ensure[ ] informational equality between the parties" and that an "informational imbalance" gives the non-producing party an unfair advantage in a civil proceeding).

After being informed by Mr. Rosenberg that Mr. Hayes was in possession of the Wiretap Materials, plaintiff sent Mr. Hayes a letter requesting the materials. Plaintiff asserts that in their initial telephone conversation regarding the Wiretap Materials, Mr. Hayes informed plaintiff's counsel that he "threw out these materials within the past two weeks while cleaning out [his] office." *See* 9/28/10 Letter from J. Marks to E. Hayes, Docket 975, Ex. 15. Mr. Hayes responded that "[u]pone [sic] reflection, my respse [sic] to your phone call was not completely accurate and therefore neither is your summary. I want to seek some advice on this matter and will answer you after I do." 9/28/10 Email from E. Hayes to J. Marks, Docket 975, Ex. 15. Ultimately, Mr. Hayes informed plaintiff that he did not have any tapes. He stated that he "remember[ed] throwing out a box of Kagan material over a month ago, but didn't see any tapes in that box." He further stated that he did "remember giving Jakob Kagan a number of tapes to listen to which he did not return. He may have returned some tapes, I am not sure." Finally, Mr. Hayes stated that "[t]he matter never appeared to me as a case that would be tried and so my listening to the tapes was somewhat limited. I had no idea that these tapes were going to be something at issue in any civil trial. Nobody told me that they would be and I never gave the matter any thought." 9/30/10 Email from E. Hayes to J. Marks, Docket 975, Ex. 18.

Subsequently, defendant Kagan, through Mr. Hayes, represented to the court that he found the Wiretap Materials among 36 compact discs ("cds") provided to him in the criminal discovery. Because of the burden of reviewing all 36 cds (many of which were in Russian) to pull out only the Wiretap Materials I ordered to be turned over, the OAG offered to provide plaintiff with the relevant materials, *if* defendant Kagan would provide to the OAG the entirety of the wiretap recordings it had turned over in the criminal

---

**5.** One affidavit supported a request for a search warrant, discussed further below, and one affidavit supported a request for attachment.

**6.** Initially, Judge Gold denied plaintiff's motion to compel, finding that New York law prohibited

disclosure. 3/18/10 Hearing Tr., at 44, Docket 872, Ex. 1. Plaintiff appealed the decision, and I found that federal law controlled discovery of the Wiretap Materials and ordered their production.

proceedings.[7] However, shortly after defendant Kagan's wife (co-defendant Victoria Kagan) turned over the 36 cds to Mr. Hayes, the OAG notified the court that the Wiretap Materials were not in fact included.[8] In sum, the Wiretap Materials were either destroyed by Kagan or an agent of Kagan or are being deliberately withheld.

After plaintiff learned that it would not be receiving the Wiretap Materials sought, it renewed its Motion for Case Terminating Sanctions. In support of its motion, plaintiff points to the OAG affidavits to establish the importance of the content on the Wiretap Materials.

The OAG affidavits describe, and in many instances quote from, wiretap conversations that reveal Kagan as the secret, illegal "owner of six no-fault clinics located in Brooklyn, Manhattan, Bronx, Queens, and Staten Island"—a central claim of plaintiff's action. *See* Pl.'s Mot. for Sanctions, Ex. 3, ¶ 35. The affidavits show that the "clinics, which are purportedly owned by licensed medical professionals, are, in fact, controlled by Kagan." *Id.* ¶ 35. For instance, the affidavits describe countless calls in which Kagan, on behalf of Clinic defendants, discusses with "steerers"[9] how they will go about bringing motor vehicle accident victims (either legitimate or staged) to various Kagan-owned clinics. *Id.* ¶¶ 86–122. The affidavits further describe wiretap conversations in which "Kagan exercises control over … hiring and supervising medical personnel, dictating treatment and testing of patients, and directing attorneys in the handling of no-fault law-

suits and arbitrations over claims denied by insurance carriers." *Id.* ¶ 35. The conversations reflect that Kagan "hired and recruited medical providers to staff his clinics" and instructed them on "how to handle inquiries from insurance industry investigators" in order to conceal Kagan's ownership of the clinics. *Id.* ¶ 136.

Likewise, the OAG affidavits show that the Wiretap Materials would establish that Kagan engaged in the "submission of fraudulent claims to insurance carriers for treatment not medically necessary or not provided." *Id.* ¶ 34. For instance, the OAG affidavits describe in detail phone calls between Kagan and accident "victims" in which Kagan discusses the protocol that every injured person at his clinics goes through in order to "maximize profits" without regard for the "medical needs of the patients." *Id.* ¶¶ 143–46. This protocol included the provision of medically unnecessary durable medical equipment—another central claim of plaintiff's action against Kagan. *Id.* ¶¶ 143–46, 152.

In sum, the OAG affidavits establish that the Wiretap Materials, which have either been destroyed at a time that they were known to be sought by the plaintiff or deliberately withheld, contain evidence that is highly probative of plaintiff's allegations.

### Destruction of the Computer Hard Drives

On November 21, 2006, in connection with the investigation discussed above, the OAG executed a search warrant at the location of Mirka United and Mara Services, Inc., alleged to be another of Kagan's businesses.

---

7. The OAG sought the return of the wiretap recordings and transcripts because there remains an ongoing investigation into the conduct of other individuals heard on the recordings, and defendant Kagan had not been prohibited from disclosing the recordings to others. Without the OAG's cooperation, it is unlikely plaintiff could compel the OAG to produce the Wiretap Materials. *See NBC v. U.S. Dept. of Justice*, 735 F.2d 51 (2d Cir.1984).

8. At defendant Kagan's recent deposition, taken long after this motion was fully submitted and argued, he asserted his Fifth Amendment rights to all substantive questions, but not to those regarding the Wiretap Materials. Kagan asserted that there were two sets of recordings he obtained from the OAG. One set included 36

cds, and a separate set included 8 cds. Kagan stated that he kept the 36 but, pursuant to Mr. Hayes's instruction, returned to Mr. Hayes the 8 cds. Although the OAG represented that it was the 8 cds that contained the Wiretap Materials, Kagan testified that the 36 cds *also* contained the relevant Wiretap Materials. I have no reason to doubt the OAG's representation and will accept that the 36 cds they received from Kagan do not contain the Wiretap Materials.

9. A "steerer" is someone who, for a referral fee, illegally obtains from hospitals the name and insurance information of accident victims. Also, they sometimes solicit individuals to stage accidents so that the "victim" may be treated at one of the Clinic defendants. *See* Pl.'s Mot. for Sanctions, Ex. 3, ¶ 9.

The product of that search included ten computer hard drives. On December 8, 2006, defendant Kagan, through Mirka United, brought a lawsuit under 42 U.S.C. § 1983, alleging that the search was illegal and requesting the return of the computer hard drives. *See* Pl.'s Mot. for Sanctions, Ex. 20. The OAG then returned the hard drives, while retaining copies for itself.[10] *Id.*, Ex. 21. After Kagan and Mirka United refused to produce the hard drives in response to a discovery request, plaintiff filed a motion to compel.[11]

In response, Mr. Rosenberg alerted the court that, "Mr. Kagan is not in possession of the computers which State Farm refers to. Undersigned counsel has been advised that upon receipt of the computers from the Attorney General, the computers were discarded. . . ." After Judge Gold found that there were relevant documents on the discarded hard drives, Mr. Rosenberg represented that defendant Kagan could obtain a copy of the hard drives from the OAG. Judge Gold advised Mr. Rosenberg that he "better, because to me the notion that [Kagan] would destroy material in the middle of litigation is grounds for default judgment against him." 4/6/09 Hearing Tr., Docket 704, at 65–68. He found that the relevance of the hard drives, and therefore Kagan's duty to preserve them, had been clearly established at previous hearings at which Kagan had been present. *Id.* Judge Gold's ruling was affirmed on November 13, 2009.

In order for the OAG to release copies of the hard drives, it required defendant Kagan to execute waivers for production. Despite having brought suit to reclaim all ten computers from the OAG, Kagan now disclaimed ownership of three of the computers, and he refused to execute waivers for the hard drives. After nearly five additional months of motion practice, Judge Gold, at a hearing on March 18, 2010, obtained the OAG's agreement to join in a motion to the state court requesting authorization to release the hard drives. Judge Gold stated that "[w]hat appears to this court is that Mr. Kagan has decided to waive his interest in some computers that he thinks are not incriminating and refused to waive them in others that probably are." 3/18/10 Hearing Tr., Docket 864, at 15. Judge Gold stated that "the court is being manipulated," and he found Kagan's assertion that he did not own the computers to be "illogical, unfair, and disingenuous." *Id.* at 17. State Farm received the computers from the OAG in late March 2010.

### Failure to Produce Documents Related to Asset Dissipation

After learning of certain financial transactions engaged in by defendant Kagan, plaintiff filed a motion for prejudgment attachment. Plaintiff pointed to the dissipation of over $500,000 in assets, which occurred within twelve months of the filing of plaintiff's complaint. In response, Kagan submitted to the court an affidavit stating that, despite the asset movement, he still owned two properties, one of which was worth over one million dollars, from which plaintiff could enforce any judgment against him. In light of Kagan's representations regarding remaining real estate, Judge Gold denied plaintiff's motion. Because of the nature of the transfers, however, he authorized discovery of Kagan's assets.

Kagan failed to produce the requested documents, requiring plaintiff to file another motion to compel, which Judge Gold granted. Kagan, however, continue to refuse to produce the documents, now asserting his Fifth Amendment privilege regarding asset movement. Based on the inferences that plaintiff believed could be drawn from this assertion, plaintiff renewed its motion for attachment.

Among the issues plaintiff raised in its renewed motion was that defendant Kagan transferred to an LLC the one million dollar property (the "LLC property") he previously asserted as available to satisfy a potential judgment. In light of Kagan's representa-

---

**10.** Justice Chun, in the same opinion upholding the wiretaps, upheld the search of Kagan's businesses.

**11.** Defendant Kagan and defendant Mirka United originally retained separate counsel. However, after Mirka United failed to pay its separate counsel, the court allowed him to withdraw, and Mr. Rosenberg took over as counsel for Mirka United as well as Kagan.

tion that he and his wife were 100% owners of the LLC, however, Judge Gold recommended that plaintiff's motion be denied, but ordered discovery of the LLC's operating agreement as well as documents relating to any of the LLC's financial accounts. I adopted Judge Gold's recommendation without objection.

Kagan again failed to produce the documents Judge Gold ordered he turn over. Instead, Kagan submitted an affidavit from his wife's attorney which stated that the LLC had neither an operating agreement nor any bank or investment accounts. The affidavit concluded by assuring both plaintiff and the court that "any judgment creditor of Jacob Kagan" can execute on the LLC property.

Kagan then disposed of the LLC Property, and Judge Gold ordered immediate production of documents reflecting disbursement of the proceeds. Again, Kagan failed to comply with the court's orders,[12] thereby necessitating yet another motion to compel, which Judge Gold granted. Judge Gold ordered Kagan to provide a "detailed explanation" regarding the proceeds, including "documentation that would demonstrate the proceeds of the sale weren't used in anything but legitimate ways." Kagan provided no explanation and no documentation regarding the proceeds, and therefore plaintiff renewed its motion to attach Kagan's assets.

In support of its motion, plaintiff alerted the court that it learned that, of the $733,000 of profit generated by the sale, an unexplained $443,230.20 was paid to an attorney and an accountant of defendant Kagan. In a letter submitted to the court through his attorney, Kagan asserted that he "was forced to sell" the LLC Property to raise funds to pay restitution ordered in his criminal case. During oral argument, however, Kagan's counsel acknowledged that less than $50,000 of the sale's profits were used for restitution. Judge Gold, therefore, recommended that Kagan's assets be attached, and ordered defendant Kagan to produce documents relating to the disposition of the sale profits. The

record reflects that Kagan has yet to produce these documents.

On September 22, 2010, I adopted Judge Gold's Report & Recommendation, finding it significant that, in addition to his failure to produce documents, Kagan disposed of the very property he previously proffered as a significant basis for denying attachment. I also noted that, in addition to proving Kagan's intent to frustrate a potential judgment, plaintiff had established its probability of success at trial. I therefore ordered that defendant Kagan was prevented from selling, transferring, or in any way encumbering his two remaining real properties.

## DISCUSSION

Under Federal Rule of Civil Procedure 37(b)(2)(A)(vi), if a party fails to obey discovery orders of the court, the court may render a default judgment against the disobedient party. Of course, sanctions of the harshest nature should not be imposed lightly, but only where "willfulness, bad faith, or any fault" on the part of the disobedient party has been established, *Societe Internationale v. Rogers,* 357 U.S. 197, 212, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); gross professional negligence qualifies as "fault" under this doctrine. *Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1065–66 (2d Cir.1979). However, "in this day of burgeoning, costly and protracted litigation courts should not shrink from imposing harsh sanctions where they are clearly warranted." *Jones v, Niagara Frontier Transp. Auth.,* 836 F.2d 731, 735 (2d Cir.1987).

In evaluating a request for sanctions, especially for the severe sanction of default judgment, pursuant to Rule 37, courts consider several factors, including: (1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance. *S. New Eng. Tel. Co. v. Global NAPs Inc.,* 624 F.3d

---

12. Kagan did produce eight pages of documents that provided a dearth of information as to the whereabouts of the proceeds. At the subsequent hearing on the motion to compel, Judge Gold found the production to be "blatantly deficient."

123, 144 (2d Cir.2010). The Second Circuit has "consistently rejected the 'no harm, no foul' standard for evaluating discovery sanctions, ... [finding that a]lthough *one* purpose of Rule 37 sanctions [is to] protect other parties to the litigation from prejudice ... Rule 37 sanctions serve other functions unrelated to the prejudice suffered by individual litigants," including specific and general deterrence. *S. New Eng. Tel. Co.*, 624 F.3d at 144 (emphasis in the original) (citing *Nat'l Hockey League et al. v. Metro. Hockey Club*, 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (noting that Rule 37 sanctions may be used both to "penalize those whose conduct may be deemed to warrant" them and to "deter those [in other litigation] who might be tempted to such conduct in the absence of such a deterrent")). Nonetheless, the court, in fashioning an order that is just, will consider prejudice suffered by the moving party. *Am. Cash Card Corp. v. AT & T*, 184 F.R.D. 521, 523 (S.D.N.Y.1999) (Chin, J.), *aff'd* 210 F.3d 354 (2d Cir.2000).

**Prejudice to State Farm**

Plaintiff has, over the course of several years, "had to devote extensive time and resources to trying to obtain the most basic discovery, and the case has been delayed." *Am. Cash*, 184 F.R.D. at 525 (finding default sanctions appropriate when, "despite the passage of many months, the issuance of repeated court orders, and two sanctions motions," the offending party had yet to comply with the court's orders). As a result of defendants' conduct, plaintiff has been forced to file innumerable motions to compel, litigate with incomplete sets of documents, and bring in third parties such as the OAG in order to obtain documents to which it was entitled. Defendants do not dispute any of these facts.

Second, Kagan's failure to produce documents related to his dissipation of assets has prevented plaintiff from discovering the whereabouts of significant sums of money from which plaintiff could satisfy a money judgment. I also note, with regard to the destruction of Kagan's computers, that, were it not for the OAG agreeing to produce copies in its possession, plaintiff would have been deprived of that significant evidence as well.

Finally, and most importantly, with regard to the spoliation of or intentional failure to produce the Wiretap Materials, plaintiff was deprived of significant evidence material to its case against defendants Kagan and Mirka United. As discussed above, the OAG affidavits demonstrate that the recordings contain material that goes to the heart of plaintiff's case against Kagan. Although defendant Kagan's failure to produce the Wiretap Materials ensures neither plaintiff nor the court will ever know the full extent of relevant evidence contained within them, the OAG affidavits establish that the Wiretap Materials would have provided substantial support to plaintiff's case. *See Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir.1998) (holding that, although the task of determining the content of destroyed evidence is "unavoidably imperfect ... care should be taken not to require too specific level of proof"). Here, plaintiff has produced significant, direct evidence of the content of the Wiretap Materials, and defendant Kagan has never rebutted the significance or breadth plaintiff ascribes to them.

Default sanctions are therefore supported by the prejudice plaintiff has suffered.[13]

**Willfulness, Bad Faith, or Gross Professional Negligence**

Defendant Kagan's conduct demonstrates a willful disregard for his obligations in this

---

**13.** Although the remedial purpose of Rule 37 supports plaintiff's Motion for Sanctions, the motion is independently supported by the two additional purposes underlying Rule 37. Default sanctions are necessary as a specific deterrent to defendant Kagan in this case. As discussed further below, Kagan has failed to abide by the orders of this court at every stage of the nearly seven years of litigation, despite the imposition of lesser sanctions and the threat of default. Like-

wise, default sanctions are necessary in this case as a general deterrent, to deter other parties in other litigation from engaging in conduct similar to that of Kagan's. If this court were not to issue a default in response to Kagan's serious misconduct, "other parties to other lawsuits would feel freer than ... Rule 37 contemplates they should feel to flout other discovery orders of other district courts." *Nat'l Hockey*, 427 U.S. at 643, 96 S.Ct. 2778.

action. There is nothing in the record that would demonstrate that Kagan's conduct was merely an oversight or was the product of a good faith attempt at compliance.

With regard to the destruction of the computers that the OAG returned to him, defendant Kagan admitted that he destroyed them immediately upon receipt. Then, Kagan refused to execute waivers for plaintiff to obtain copies of the drives from the OAG, disclaiming an interest in three of the computers despite having sued for their return. As a result of Kagan's disregard for the court's order that he execute the waivers, the court was forced to ask the OAG to join in a motion to New York state court to obtain copies.

Likewise, with regard to his failure to produce documents related to asset dissipation, defendant Kagan exhibited bad faith in his attempt to preclude plaintiff from discovering the whereabouts of the monies in question. Despite Kagan's dissipation of assets and failure to produce related documents, the court exhibited continued patience with Kagan, repeatedly giving him the benefit of the doubt, provided he turn over discovery regarding the transfers. Only when Kagan disposed of the very property he represented as ample to satisfy any judgment, and refused no less than three orders to produce documents evidencing the disposition of the proceeds, did Judge Gold recommend, and I order, attachment of Kagan's remaining assets.

Finally, there is ample evidence in the record to demonstrate defendant Kagan's at least grossly negligent spoliation of the Wiretap Materials.[14] Both defendant Kagan and his attorneys were on notice as early as April 2009 that the Wiretap Materials were relevant to this case and were sought by plaintiff. The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation. *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir.2001). Neither Kagan nor any of his counsel has at any point directed the court to *any measures* taken to preserve the Wiretap Materials. Furthermore, at no point during any of the extensive briefing on this matter did Kagan alert plaintiff or the court that the Wiretap Materials were missing. Only *after* a year of motion practice was complete, and I ordered production of the Wiretap materials, did he alert plaintiff that the materials were (allegedly) no longer in existence.

■ In sum, defendant Kagan's conduct exhibits willful disregard of court orders, intentional spoliation of relevant evidence, and at least gross negligence in the failure to preserve critical materials, all of which sufficiently support plaintiff's Motion for Sanctions.[15]

### Efficacy of Lesser Sanctions

Lesser sanctions would neither adequately deter nor remedy misconduct of this severity. When it came to light that defendant Kagan destroyed the computer hard drives, Judge Gold advised Kagan that he considered that grounds for default sanctions. Yet even af-

---

**14.** As discussed above, there is some ambiguity in the record as to the disposition of the Wiretap Materials. Plaintiff provided evidence that suggests the materials were intentionally destroyed. However, regardless of whether the failure to produce these materials resulted from intentional destruction, gross professional negligence, or a willful refusal to produce, default sanctions are warranted.

**15.** Defendant Kagan can find no protection in an assertion that it was his attorney, and not himself, who was responsible for the violations in question. "A litigant chooses counsel at his peril, and here, as in countless other contexts, counsel's disregard of his professional responsibilities can lead to extinction of his client's claim." *Am. Cash Card Corp. v. AT & T Corp.*, 2000 WL

357670, at \*5, 2000 U.S.App. LEXIS 6318, at \*17 (2d Cir. Apr. 6, 2000) (quoting *Cine Forty–Second St. Theatre Corp.*, 602 F.2d at 1068); *see also Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) ("There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney ... and he cannot now avoid the consequences of [lack of prosecution by] this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.")

ter this admonition, Kagan continued to ignore the court's orders and thwart plaintiff's attempts to obtain copies of the computers. Likewise with regard to the attachment of Kagan's assets, Kagan was provided numerous opportunities to explain with documentary evidence the legitimate bases for his transactions, but failed to do so. Even faced with attachment of his assets, Kagan continued to refuse to provide discovery the court ordered.

In the face of numerous court orders and motions to compel, defendant Kagan has refused to comply. When "less harsh sanctions, including orders compelling defendants to [comply] have already proven fruitless," the default sanction is the only appropriate remedy. *Microsoft Corp. v. Computer Care Center*, 2008 U.S. Dist. LEXIS 112080, at *14 (E.D.N.Y. Apr. 8, 2008), *adopted at* 2008 U.S. Dist. LEXIS 77853. Moreover, when a party "anticipates that ... production of damning evidence [such as the Wiretap Materials] will produce an adverse judgment, [he] will not likely be deterred from destroying that decisive evidence by any sanction less than the adverse judgment he is tempted to thus evade." *Gutman v. Klein*, 2008 WL 4682208, at *12, 2008 U.S. Dist. LEXIS 92398, at *42 (E.D.N.Y. Oct. 15, 2008) (citations omitted), *adopted at* 2008 WL 5084182, 2008 U.S. Dist. LEXIS 97707 (E.D.N.Y. Dec. 2, 2008). Thus, lesser sanctions are inappropriate to address the seriousness of defendant Kagan's conduct.[16]

**Duration of Non–Compliance**

The duration of defendants' non-compliance spans nearly the entire length of this seven-year litigation. As detailed extensively above, Kagan has been involved in a "pattern of prolonged and vexatious obstruction of discovery with respect to highly relevant records." *S. New Eng. Tel. Co.*, 624 F.3d at 144. Kagan and Mirka United have been the subject of numerous successful motions to compel and repeated court orders addressing deficiencies in defendants' productions. "If parties are allowed to flout their obligations ... the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules." *Cine Forty–Second St. Theatre Corp.*, 602 F.2d at 1068.

**History of Warnings**

As has already been discussed above at length, the court has warned defendants and their counsel that failing to comply with discovery orders could result in sanctions, expressly warning of the possibility of default sanctions. Having given the defendants express warnings about the consequences of their conduct, and ample time to comply with the orders of this court, default sanctions are both reasonable and appropriate.

## CONCLUSION

Defendant Kagan has exhibited in this case exactly the type of serious misconduct Rule 37 is designed to deter. Throughout this litigation, Kagan and Mirka United have resisted providing discovery or co-operating with plaintiff in any meaningful way. Their actions have resulted in a waste of judicial resources over the course of the last seven years and have required this court to become the micromanager of discovery in this litigation. For these reasons, and all the reasons set forth above, plaintiffs Motion for Case Terminating Sanctions Against Defendants Jacob Kagan and Mirka United, Inc. is GRANTED. Plaintiff's request for further relief is DENIED. A default judgment on

---

**16.** Although not addressed by the parties, I have considered the lesser sanction of an adverse inference, but this would not restore plaintiff to the same position it would have been in absent the wrongful spoliation of evidence by defendants. From very early on in the case, continuing through and including his recent deposition, Kagan has asserted his Fifth Amendment rights to every question addressing the merits that has been presented to him. Therefore, even in the absence of a spoliation sanction, plaintiff would be entitled to a wide range of adverse inferences, and defendant Kagan would be prevented from offering any evidence on any matter to which he has asserted his Fifth Amendment rights. *See LiButti v. United States*, 107 F.3d 110, 121 (2d Cir.1997) (holding that the Fifth Amendment "does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"); *SEC v. Benson*, 657 F.Supp. 1122, 1129 (S.D.N.Y.1987) (Leval, J.) ("By hiding behind the protection of the Fifth Amendment as to his contentions ... defendant has forfeited the right to offer evidence disputing the plaintiff's evidence or supporting his own denials.").

liability will be entered against defendants Jacob Kagan and Mirka United. The damages to be awarded will await further proceedings.

**SO ORDERED**